SO ORDERED: October 15, 2010.




Anthony J. Metz III
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| TOD DOUGLASS OWENS, | ) | CASE NO. 09-06412-AJM-7 |
| | ) | |
| Debtor. | ) | |
| | ) | |
| PACIFIC NORTHWEST TITLE | ) | |
| INSURANCE COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | ADVERSARY PROCEEDING |
| | ) | NO. 09-50689 |
| TOD DOUGLASS OWENS, | ) | |
| | ) | |
| Defendant. | ) | |

**FINDINGS OF FACT and CONCLUSIONS OF LAW
AND ORDER GRANTING PACIFIC NORTHWEST TITLE
INSURANCE COMPANY'S MOTION FOR SUMMARY JUDGMENT**

The Plaintiff, Pacific Northwest Title Insurance Company ("Pacific Northwest"), commenced this adversary proceeding by filing its complaint to determine dischargeability on November 9, 2009, alleging that the debt owed by the Defendant, Tod Douglass Owens ("Owens"), was

nondischargeable under 11 U.S.C. §§523(a)(2), (4) and (6).  This matter came before the Court for hearing on September 15, 2010 upon Pacific Northwest's Motion for Summary Judgment filed May 25, 2010.  The Court having considered such Motion, the designated evidence, affidavits, brief, and other materials filed herein, and being duly advised, now finds that there is no genuine issue as to any material fact and Pacific Northwest is entitled to summary judgment on its claim for relief against Owens as a matter of law.

The Court specifically finds that Owens was duly served and filed an Answer to Pacific Northwest's Complaint in this case.  The Court has jurisdiction over Pacific Northwest and Owens and the subject matter of Pacific Northwest's Complaint. Pacific Northwest appeared at the hearing on Pacific Northwest's Motion for Summary Judgment by counsel, Bret S. Clement.  Owens failed to file a response to Pacific Northwest's Motion for Summary Judgment and Owens did not appear at the hearing thereon.  The Court further determines that the following facts are undisputed:

### Findings of Fact

1. Pacific Northwest and Executive Escrow entered into an Underwriting Agreement. The Underwriting Agreement was executed on Executive Escrow's behalf by Owens who served as President of Executive Escrow at all times following the execution of the Underwriting Agreement and owned one hundred percent (100%) of all classes of the issued and outstanding stock of Executive Escrow.

2. Pursuant to the authority granted to it in the Underwriting Agreement, Executive Escrow issued commitments for title insurance, conducted title searches and examinations, conducted closings, received funds from lenders in trust for the purpose of disbursing such funds pursuant to the lenders' instructions in insured closings, all in its capacity as Agent of Pacific Northwest.

3. Pursuant to the Underwriting Agreement, Executive Escrow agreed to serve as a closing agent for Pacific Northwest and in that capacity, it agreed that all funds it received from lenders in connection with transactions in which Pacific Northwest's title policies were to be issued would be deposited in its escrow account, separate from its individual accounts, and agreed to disburse said funds only for the purposes for which they were entrusted.

4. Executive Escrow maintained one or more escrow accounts for such purposes. It is the universal understanding of real estate lenders entrusting funds to a title agent that all such funds will be deposited in the title agent's escrow account.

5. In a typical real estate transaction, a mortgage lender delivers funds that it is loaning to the purchaser or refinancing owner to the closing agent pursuant to the terms of a Insured Closing Letter, together with instructions for disbursing those funds in connection with an Insured Closing. An "Insured Closing" is a closing of a real estate purchase or refinancing transaction wherein the closing agent, as agent of title insurer performs the functions and duties of a closing agent, which typically include the issuance of an Insured Closing Letter. An "Insured Closing Letter" is a letter issued by the closing agent in the name of title insurer guaranteeing that the funds delivered to the closing agent by the lender will be disbursed pursuant to lender's the written instructions at closing. "Escrow Funds" include any and all funds received by the closing agent from a lender in connection with an Insured Closing.

6. Prior to being disbursed as directed by lenders, any and all Escrow Funds delivered to Executive Escrow by lenders in connection with Insured Closings remained the property of the lenders and Executive Escrow had no interest in such funds, apart from the fee it was entitled to receive for performing the services of a closing agent.

7. The Underwriting Agreement prohibited Executive Escrow from paying its operating expenses directly from its escrow account(s) and any payment of its operating expenses directly from its escrow account(s) constituted a breach of the Underwriting Agreement.

8. All Escrow Funds were held in trust for the benefit of the lenders furnishing the Escrow Funds. Consequently, the failure to disburse Escrow Funds as required by the lenders' written instructions or any use of Escrow Funds in a manner inconsistent with such instructions constitutes a breach of trust.

9. Executive Escrow deposited funds received from lenders in its escrow account in connection with insured closings where it issued an Insured Closing Letter to such lender, but failed to disburse the Escrow Funds as required in connection with five (5) closings that resulted in claims being paid by Pacific Northwest under an Insured Closing Letter as follows:

| Borrower | Closing Date | Lender | Amount |
| --- | --- | --- | --- |
| Brenda K. Dawson | 06/27/07 | National City Bank | $ 186,475.56 |
| Lorna S. Pirtle | 04/20/07 | Countrywide | $ 183,812.85 |
| Anthony D. Johnson, Sr. | 01/22/07 | Lenders Diversified | $ 71,594.52 |
| Jordan C. Faris | 07/25/07 | Bank of America | $ 398,313.03 |
| Joseph and Sharine Todd | 06/07/07 | National City Bank | $ 126,920.18 |

Pacific Northwest reviewed each of the claims arising out of an insured closing letter and in each case determined that it was obligated to reimburse the lender by reason of Executive Escrow's failure to comply with the lender's written instructions.

10. The foregoing Insured Closings are hereinafter referred to as the "Dawson Closing", the "Pirtle Closing", the "Johnson Closing", the "Faris Closing" and the "Todd Closing, respectively, and are also collectively referred to as the "Subject Closings."

11. In each of the Subject Closings, the lender provided Executive Escrow with Escrow Funds, together with written instructions directing Executive Escrow to utilize those funds for the purpose of satisfying existing liens on the real property that was the subject of the respective Closing.

12. Executive Escrow issued Title Insurance Commitments on behalf of Pacific Northwest with respect to each of the Subject Closings.

13. Executive Escrow issued Insured Closing Letters on Behalf of Pacific Northwest utilizing a form letter that was pre-signed and provided by Pacific Northwest in connection with each of the Subject Closings.

14. Executive Escrow prepared a closing statement for each of the Subject Closings which were executed by the parties indicated thereon at each of the respective closings that purport to show that the holder of a pre-existing mortgage was paid the amount stated in each closing statement at closing.

15. Each of the previously identified holders of a lien on the real estate that was the subject of a Subject Closing submitted a Payoff Statement to Executive Escrow showing the amount that such lien holder required to be paid to it as a condition of the release of its lien on the real estate that was the subject of such closing.

16. The remittance copy of a check payable to Homecomings in the amount of $186,475.56 that was attached to the Requests for Admissions as Exhibit "E" was prepared in connection with the Dawson Closing, but was never sent to Homecomings. Executive Escrow failed to pay the amount of $186,475.56 to Homecomings in connection with the Dawson Closing and as a consequence thereof Executive Escrow failed to secure the release of Homecomings' lien on the real estate that was the subject of the Dawson Closing.

17. The remittance copy of a check payable to ASC in the amount of $183,812.85 that was attached to the Requests for Admissions as Exhibit "J" was prepared in connection with the Pirtle Closing, but which was never sent to ASC. Executive Escrow failed to pay the amount of $183,812.85 to ASC in connection with the Pirtle Closing and as a consequence thereof Executive Escrow failed to secure the release of ASC's lien on the real estate that was the subject of the Pirtle Closing.

18. The remittance copy of a check payable to Saxon Mortgage in the amount of $71,594.52 that was attached to the Requests for Admissions as Exhibit "O" was prepared in connection with the Johnson Closing, but which was never sent to Saxon Mortgage. Executive Escrow failed to pay the amount of $71,594.52 to ASC in connection with the Johnson Closing and as a consequence thereof Executive Escrow failed to secure the release of Saxon Mortgage's lien on the real estate that was the subject of the Johnson Closing.

19. The amount of $398,313.03 shown on Exhibit "R" to the Requests for Admission as having been paid was not paid in connection with the Faris Closing and as a consequence thereof Executive Escrow failed to secure the release of GMAC Mortgage LLC's lien on the real estate that was the subject of the Faris Closing.

20. The amount of $126,920.18 shown on Exhibit "X" to the Requests for Admission as having been paid was not paid in connection with the Todd Closing and as a consequence thereof Executive Escrow failed to secure the release of Beneficial's lien on the real estate that was the subject of the Todd Closing.

21. However, Executive Escrow did pay Beneficial the amount of $45,000.00 from the Escrow Funds received from National City in connection with the Todd Closing. Said payment was made by or under the direction of Owens for the purpose of inducing Beneficial to show same on its records as a prepayment of future mortgage payments that would otherwise come due. This was done in order to prevent Beneficial from sending out default notices that would have been sent in the ordinary course of its business had the prepayment not been made in order to delay the discovery of the fact that its mortgage had not been paid in full as required by the Special Loan Instructions received by Executive Escrow from National City.

22. Neither Executive Escrow nor Owens has provided Pacific Northwest with any explanation of what happened to the Escrow Funds that were not used to pay off the lienholders

identified herein above in excess of the amount of $343,952.66 that remained in Executive Escrow's escrow account that was turned over to Pacific Northwest.

23.     At all times relevant to the Complaint, Owens:

(a)     was fully aware of the nature of Executive Escrow's obligations under the Underwriting Agreement;

(b)     was knowledgeable regarding the nature of the obligations imposed on a title insurance company by reason of the issuance of an Insured Closing Letter by a title agent, including the fact that if a title agent failed to comply with the written instructions to use Escrow Funds to satisfy a preexisting lien on the real estate that was the subject of an Insured Closing, that the title insurer would thereby be obligated to satisfy such preexisting lien;

(c)     possessed and exercised personal authority and control with respect to performing the obligations of Executive Escrow under the Underwriting Agreement, as well as the obligations owing to lenders who entrusted Executive Escrow with funds to be disbursed in connection with insured closings;

(d)     knew that Executive Escrow had no right to use Escrow Funds for any purpose that was contrary to written instructions from the lenders who deposited such Escrow Funds with Executive Escrow and that such use was contrary to the provisions of the Underwriting Agreement; and

(e)     personally engaged in the actions or exercised personal authority and control over the actions of others that resulted in the Escrow Funds described above being used for purposes that were contrary to the written directions received from the lenders who deposited such Escrow Funds with Executive Escrow.

24.     Executive Escrow's checking account number 11073022 at Star Financial Bank was established and used as an escrow account for the purpose of holding Escrow Funds.

25. Check number 5135 payable to TDO Realty in the amount of $5,000.00 written on Executive Escrow's escrow account was signed by Owens. Owens was the Registered Agent and President of TDO Realty & Development Co., Inc. ("TDO") and Executive Escrow and TDO shared the same address.

26. Check number 5133 payable to Executive Escrow dated May 23, 2007, in the amount of $20,000.00 written on Executive Escrow's escrow account was signed by Owens.

27. Check number 5167 payable to Executive Escrow Company dated May 29, 2007, in the amount of $105,000.00 was written on Executive Escrow's escrow was signed by Owens.

28. Check number 5134 payable to Tod Owens in the amount of $2,000.00 was written on Executive Escrow's escrow account was signed by Owens.

29. Check number 5126 payable to Tod D. Owens in the amount of $5,000.00 written on Executive Escrow's escrow account was signed by Owens.

30. Check Nos. 5168, and 5177, payable to Star Financial in the amounts of $20,000.00 were written on Executive Escrow's escrow account were signed by Owens, and both checks were endorsed by Owens notwithstanding that they were written to Star Financial.

31. Executive Escrow's checking account number 11073011 at Star Financial Bank was established and used as an operating account for the purpose of paying Executive Escrow's operating expenses.

32. The endorsements on the back of the checks from Executive Escrow's escrow account made payable to Executive Escrow show that both checks were endorsed by Owens for deposit only into Executive Escrow's operating account.

33. The Operating Account History shows deposits of $20,000.00 and $105,000.00 dated May 24, 2007, and May 29, 2007, corresponding to the dates Exhibits "AA" and "CC" were written (May 23, 2007, and May 29, 2007).

34. Check number 4111 payable to TDO Realty & Development in the amount of $70,000.00 written on Executive Escrow's operating account was signed by Owens.

35. Check number 4107 payable to Cash in the amount of $15,000.00 written on Executive Escrow's operating account was signed and endorsed on the back thereof by Owens.

36. Check number 4109 payable to Cash in the amount of $10,000.00 written on Executive Escrow's operating account was signed and endorsed on the back thereof by Owens.

37. Pacific Northwest paid $594,787.91 in claims caused by Executive Escrow's failure to disburse funds according to the directions of the lenders.

38. Pacific Northwest has incurred attorneys fees and anticipates incurring attorneys fees in the amount of $39,025.00 in prosecuting this action.

## Conclusions of Law

### *Summary Judgment Standard*

39. Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgement as a matter of law." Fed. R. Civ. P.56(c).

40. The party moving for summary judgment bears the initial burden of demonstrating the basis for its motion, and identifying those portions of the "pleadings, depositions, answers to interrogatories, and admission on file, together with the affidavits if any," which demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).

41. Once the moving party has filed a properly supported motion, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).

42. To determine whether summary judgment is appropriate, the Court must determine whether any genuine issue of material facts exists. An issue is "material" only if the dispute "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, (1986).

43. An issue is "genuine" only if the evidence is such "that a reasonable jury could return a verdict for the nonmoving party." *Id.*

### *Nondischargeability under §523(a)(4)*

44. Exceptions to discharge under §523 are construed strictly against the creditor and liberally in favor of the debtor. *In re Tsikouris*, 340 B.R. 604, 607-08 (Bankr. N. D. Ind. 2006). Among the exceptions to discharge is §523(a)(4) which renders nondischargeable those debts resulting from fraud or defalcation while acting in a fiduciary capacity, or debts resulting from embezzlement or larceny. Thus, there are alternate routes of recovery under this section: a debt is nondischargeable under this section if the plaintiff can prove: (a) a fiduciary relationship existed between the debtor and the plaintiff and that the debt arose out of fraud or defalcation while acting in that fiduciary capacity *or* (b) the debt resulted from embezzlement or larceny.

### *Defalcation While Acting in a Fiduciary Capacity*

45. The "defalcation" element of §523(a)(4) includes misappropriation or failure to account for funds entrusted to a fiduciary. The fiduciary need not act in bad faith, as the defalcation can occur whether the fiduciary's acts are intentional, willful, reckless or negligent.

*See In re Storie*, 206 B.R. 283, 288 (B.A.P. 10th Cir. 1987) (citing *Central Hanover Bank & Trust Co. v. Herbst*, 93 F.2d 510, 511-12 (2d Cir. 1937) (Hand, J.).

46. The defalcation must be committed by the debtor while the debtor is acting in a fiduciary capacity. Whether a fiduciary or trust relationship exists between the creditor and the debtor is a question of federal law. State law may be consulted as to whether a trust relationship is created, but it is federal law that ultimately governs determinations of nondischargeability for §523(a)(4) purposes. *In re Guy*, 101 B.R. 961, 983 (Bankr. N. D. Ind. 1988).

47. "Fiduciary" has a limited meaning under federal bankruptcy law and 'not all fiduciary relationships qualify" as the type of fiduciary relationship needed for a nondischargeability finding under §523(a)(4). For one, "the fiduciary's obligation must exist prior to the alleged wrong", and also exist "without any reference to the wrong and be independent of it". *In re Frain*, 230 F.3d 1014, 1017 (7th Cir. 2000); See also, *Guy*, 101 B.R.at 983; *Tsikouris*, 340 B.R. at 610. Thus, constructive trusts and trust relationships implied by law where the fiduciary duty is created *ex maleficio* (founded on the wrongdoing or tort) do not create a fiduciary duty for §523(a)(4) purposes even though they may create such duties under applicable state law. *Guy*, 101 B.R. at 983; *Frain*, 230 F.3d at 1017.

48. This narrower definition of "fiduciary" under the bankruptcy code, then, includes only express or technical trusts that existed between the debtor and the creditor *before* the alleged wrongdoing occurred. *Guy*, 101 B.R at 983.

49. Here, Owens, through Executive Escrow, was required to segregate and deposit into its Escrow Account the lenders' funds and disburse said funds only for the purposes for which they were entrusted under the Underwriting Agreement. Under no circumstances could the Funds be directly used to pay Executive Escrow's operating expenses. The Funds remained property of the lenders and Executive Escrow had no interest in the Funds prior to

their directed disbursement, apart from the closing agent fees it was entitled to receive. The Underwriting Agreement contained the attributes of an express trust, and therefore, Owens, through Executive Escrow, was a "fiduciary" for §523(a)(4) purposes. *In re McGee*, 353 F.3d 537 (7th Cir. 2003) (city ordinance that required segregation of security deposit funds by landlords created a "fiduciary" relationship between the chapter 7 landlord and her tenants).

### *Nondischargeability under §523(a)(6)*

50. Under §523(a)(6), a debt is nondischargeable if it is a debt for willful and malicious injury by the debtor to another entity or to the property of another entity. A plaintiff seeking nondischargeability under this section must prove by a preponderance of the evidence that (1) the defendant caused an injury; (2) the defendant's actions were willful; and (3) the defendant's actions were malicious. An act is "willful" if it is intended to cause the resulting injury; an intentional act that leads to an unintended injury does not suffice. *Kawaauhua v. Geiger*, 523 U.S. 57, 61, 118 S. Ct. 974, 140 L. Ed.2d 90 (1998). "Malicious" means "in conscious disregard of one's duties or without just cause or excuse". *In re Thirtyacre,* 36 F.3d 697, 700 (7th Cir. 1994).

51. The Court concludes that Executive Escrow converted escrow funds delivered to it by lenders, in connection with Insured Closings described in the foregoing findings of undisputed facts, while acting as Closing Agent.

52. Pacific Northwest paid claims asserted by lenders against Pacific Northwest under the insured closing letters issued by Executive Escrow on Pacific Northwest's behalf in connection with each of the insured closings described in the foregoing findings of undisputed facts.

53. By reason of Pacific Northwest's payment of such claims and the express provisions of Exclusion B set forth in each of the Insured Closing Letters, Pacific Northwest is

subrogated to all of the rights and remedies each lender would have had against Executive Escrow had the lenders not been reimbursed by Pacific Northwest.

54. By reason of Owens' personal participation in the conversion of the Escrow Funds and Owens' admissions that Owens personally engaged in the actions or exercised personal authority and control over the actions of others that resulted in the Escrow Funds being used for purposes that were contrary to the written directions received from the lenders who deposited such Escrow Funds with Executive Escrow, Owens is personally liable, along with Executive Escrow, for the conversion of such Escrow Funds.

55 Executive Escrow's conversion of the Escrow Funds breached Executive Escrow's fiduciary duties to the lenders who entrusted those funds to Executive Escrow and Owens' participation in and the exercise of personal authority and control over the actions of others renders Owens liable for such breach of fiduciary duty.

56 Owens' actions on behalf of Executive Escrow caused an injury to the property of Pacific Northwest by reason of Pacific Northwest's payments pursuant to the insured closing letters issued by Executive Escrow on Pacific Northwest's behalf to the lenders of the losses the lenders incurred by reason of Executive Escrow and Owens' conversion of the monies entrusted to Executive Escrow by such lenders.

57 Owens' possessed sufficient knowledge of the title insurance industry, the nature of the obligations assumed by Executive Escrow under the Underwriting Agreement and the insured closing letters it issued on behalf of Pacific Northwest, such that he knew that losses were substantially certain to be incurred by Pacific Northwest if he converted the lenders' funds entrusted to Executive Escrow in connection with insured closings. Consequently Owens' actions on behalf of Executive Escrow which caused injury the injury to Pacific Northwest were the result of willful conduct by Owens by which Owens intended to effect an injury to Pacific Northwest's property.

58. Owens' willful acts on behalf of Executive Escrow were undertaken in a malicious manner, that is, with conscious disregard of Owens' duties or without just cause or excuse.

59. By reason of Owens' willfully and maliciously causing injury to the property of Pacific Northwest', Pacific Northwest's claims against Owens herein are non-dischargeable pursuant to 11 U.S.C. § 523(a)(6).

60. Pacific Northwest is entitled to treble damages, attorneys fees, costs and other damages pursuant to IC 34-23-3-1 which applies where a person suffers pecuniary loss by reason of a violation of a provision found in IC 35-43.

61. IC 35-43-4-3 applies to conversion generally and provides that a person who "knowingly or intentionally exerts unauthorized control over property of another person commits criminal conversion.

62. A person acts knowingly if, at the time of the conduct, the person is aware of a high probability that he or she is doing so. IC 35-41-2(b). A person acts intentionally if, when he or she engages in the conduct, it is the person's conscious objective to do so. IC 35-41-2(a). The same facts that establish that Owens' conduct was willful for purposes of § 523(a)(6) likewise establish that his conduct was knowing or intentional for purposes of the Indiana criminal conversion statute.

63. In addition to the general conversion statute, IC 35-43-9-7 makes it a crime to knowingly or intentionally convert or misappropriate title insurance escrow funds. Owens knowingly and intentionally converted title insurance escrow funds.

64. IC 35-43-5-3(a)(3) provides that a person commits deception "if a person misapplies entrusted property . . . in a manner that the person knows is unlawful or that the person knows involves substantial risk of loss or detriment to either the owner of the property or to a person for whose benefit the property was entrusted." For purposes of IC 35-43-5-3(3),

"entrusted" property includes property "held in a fiduciary capacity." IC 35-43-5-1(g).  Owens misapplied entrusted property held in a fiduciary capacity in a manner that knew was unlawful or that he knew involved a substantial risk of loss to the owner of the property or the person for whose benefit the property was entrusted.

65. Pacific Northwest is entitled to treble damages, attorneys fees, costs and other damages, pursuant to IC 34-23-3-1, by reason of the pecuniary losses suffered by Pacific Northwest as a result of Owens' violations of IC 35-43 described above.

66. Pacific Northwest incurred actual damages in the amount of $594,787.91 by reason of Owens' actions described herein above.

67. Pacific Northwest's incurred attorneys' fees in the amount of $39,025.00 by reason of Owens' actions described herein above and the amount of such fees is reasonable.

68. Based upon the undisputed evidence before the Court, Pacific Northwest is entitled to summary judgment on its Complaint against Owens.

IT IS, THEREFORE, ORDERED, ADJUDGED, AND DECREED THAT:

(A) Pacific Northwest's Motion for Summary Judgment against Owens on Pacific Northwest's Complaint is hereby granted;

(B) judgment is hereby entered in favor of Pacific Northwest against Owens on Pacific Northwest's Complaint for the following amounts:

(1) $1,784,363.73 (three [3] times the actual damages in the amount of $594,787.91 suffered by Pacific Northwest with respect to converted escrow funds);

(2) Pacific Northwest's reasonable attorneys' fees in the amount of $39,025.00; and

(4) costs of this action in the amount of $250.00.

The total of such sums is $1,823,638.73.

(C) There is no just reason for delay in entering final judgment in favor of Pacific Northwest against said Defendant, and the Court hereby directs, pursuant to Bankruptcy Rule 7056 incorporating FRCP 56, the entry of final judgment in favor of Pacific Northwest against said Defendant herein.

# # #

Distribution:

Bret S. Clement, Attorney for the Plaintiff
Tod Douglass Owens, Defendant
Case Trustee